Lisa, can we call the first case or the only case? 16-2897, in re Christian W., a minor. Will the attorneys presenting argument today please approach, introduce yourselves, spell your last names for the record. Good morning. My name is Maria Fualo and I represent the petitioner Christian in this case. Good morning. Good morning, your honors. Assistant State's Attorney Joseph Alexander on behalf of the people of the state of Illinois. Good morning. Could you pronounce your name again? Maria Fualo. Fualo, thank you. Mr. Alexander, good morning. Okay, counsel, we normally allocate about 15 minutes per side in an oral argument. I think it's fair to speculate we will go beyond 15 minutes today. We're not going to let that get in the way of whatever questions we have. We're going to make sure everyone has a full chance to make their arguments. Ms. Fualo, you'd like to reserve some time, I assume, for rebuttal? Yes, sir. Sure. We'll make sure you have the time that you need. All right. Well, thank you very much, Mr. Alexander. You can take your seat. Ms. Fualo, when you are ready, we are. Thank you. Thank you, your honor, and good morning. May it please the court. 14-year-old Christian was convicted of an attempted murder based on nothing more than Michael Bryant's testimony at trial. Testimony that was inherently unreliable, untrustworthy, and insufficient. Now, I acknowledge and respect the deference given the trier of fact when making credibility and demeanor determinations. Yet, that deference and those determinations are not conclusive. And in this unusual case involving an eyewitness, the only witness presented by the State, who initially claimed and described a stranger, did the shooting. And then later, days later, claimed it was Christian, someone he had known. Did he describe him as a stranger to the police? Your honor, he did not say the words, this was a stranger. But the description he gave was not the same as what later appears to be the respondent here. Right, neither matched, did not describe Christian himself, not by age, height, weight, hair, complexion, or the unique characteristics of Christian, so not by description. And also, critically, he said nothing about knowing this individual, seeing this individual in the neighborhood, knowing him by name, knowing him by association, by the clothing. Was he describing the second shooter? Was he describing Munchie? Was his description, 5'4", 5'5", 140, 145 pounds, did that describe Munchie? Well, your honor, first of all, the evidence in the record simply isn't clear about that point. And that's because Michael Bryant gave several different descriptions of several different shooting instances. Okay, but I'm back with when he was talking to Rios. Yes, your honor. At the hospital. Is there anything in the record that gives us the height and weight of Mr. McGee, of Munchie? Not as far as I know. Is he giving 5'4", 5'5", or do we not know? Your honor, not as far as I know, and I don't believe there's evidence in the record with respect to that. But with respect to Munchie's description, and there are, as the court knows from the briefs, there are two different Munchies here. The first Munchie described, according to Michael Bryant's statement to the state in June of 2016 when he met with them. But the first Munchie, Devon McGee, the only description given is short hair, medium complexion. That was the description later given of this other individual. But nothing about the red, green, or brown hoodie. And critically, when he talks to Detective Rios, and he is clear on this point, he describes a single shooter, the shooter who shoots Trebatas, his brother. So whether or not that could fit the description of Munchie, something that's not in the record, the person he described to Rios is the person who shot Trebatas. And that description doesn't match Christian. And also, he says nothing about knowing these individuals or this individual. Would it be fair to describe, if we're taking the evidence in the light most favorable to the state, would it be fair to describe from the record, from the evidence we heard at trial, the conversation between Rios and Michael Bryant at the hospital to be somewhat chaotic, disjointed, and less than complete? Well, Your Honor, I don't know whether it was chaotic. I don't think that the evidence at trial is that it was chaotic. But that it did happen shortly after the shooting, a couple hours after the shooting. And that, yes, he was in a state of, you know, excitement or shock after the shooting. Notwithstanding that, he gave detailed information both about the suspect and the description of the events to Detective Rios. Detective Rios testified. But at some point he cut off the question, right? He told the detective he didn't want to talk to him anymore. Well, I don't know that that's – the detective testified that, you know, he got a – that there was an interview that was – you know, it wasn't a lengthy interview by any means. But I don't think that neither Michael Bryant nor Detective Rios testified that Michael Bryant said, I don't want to talk to you. Were this a case when – if the detective appeared and he said, I don't want to talk to you, I have nothing to say to you, or Michael Bryant was silent, then we're – well, we have different circumstances. But that's not what happened here. Detective Rios came. He said what happened, who did it, and Michael Bryant gave a fairly detailed description of the shooter and of what happened. Black revolver, comes out of the gangway, 5'4"-5'5", 140 to 145 pounds, short hair, medium complexions, red, green, brown hoodie. These are details that go beyond just a general description. Details that describe a stranger and not Christian. And so, Your Honor, for three reasons – Your Honors, for three reasons, reversal is necessary in this case. First, Michael Bryant is inherently untrustworthy and unreliable and no rational prior effect could credit his testimony. Two, no other independent or physical – or no independent or physical evidence connects Christian to this case. And three, unrebutted alibi evidence disregarded by the prior effect further undermines Michael Bryant's weak identification and warrants reversal. What do you mean by unrebutted alibi testimony? Well, Your Honor, in this case, two defense witnesses testified that Christian was somewhere else at the time of the crime. He was 13 miles away, close to an hour by public transportation at someone else's house. And that testimony was not impeached, other than by Michael Bryant's testimony about who the shooter was, was not impeached or otherwise rebutted by the State in this case. That is, they didn't call someone to testify. Is that how normally it's done? They call someone to then say what? Well, no, Your Honor, but there are – it's not – it wasn't impeached with respect to, you know, the detective – – and interview the witnesses or witness at the house, and the detective learned that the – Michael – Christian wasn't present. It was – it wasn't in any way contradicted, other than by Michael Bryant's testimony. Was this the same – so this – this Devon McGee, is that how you pronounce his name? Yes, Your Honor. So he was actually the first McGee that Michael Bryant described as this – as one of the shooters, wasn't he? Well, I think that he was – Or at least that same name with the same nickname. The same name with the same nickname, and who later Michael Bryant said wasn't the shooter and was, in fact, a Donovan McGee, and then later Michael Bryant again gave a different statement about who that second shooter was. So Devon McGee and La'Kevion, the sister – Yes. – one of the family members, both testified that they recall the food that came the night before, that they were eating the gyros, that they stayed up late, that they all spent the night there, that they woke up the following day. Doesn't – And the state suggests in their brief that actually somehow that morning there was a discussion about the twins. They were referred to as the twins, right? Brothers. How were they referred to? Yes, the twins. But they weren't twins. But prurin bodice. They were brothers, right? Yes. But wasn't there some suggestion that they became aware of the shooting before it occurred and that the alibi actually didn't cover the time frame that the shooting occurred? Your Honor, but that mischaracterizes the evidence in this case. Well, there wasn't any set – What time was the shooting? The shooting happened at – According to Michael. According to Michael Bryant, the shooting happened at, I believe it was 1 p.m., he says. But the evidence in the case – No, Michael says 3 o'clock. The evidence in the case shows the shooting happened at, I believe, 1 p.m. There's a discrepancy between when – When did the shooting occur without the testimony of the eyewitness? At 1. I'm just asking. You're saying it occurred at 1. The eyewitness said it occurred at 3. Well, Your Honor, the detective, Detective Rios testified about when they received a call. So there's a shooting testimony that the shooting occurred at a time different than when Michael testified it occurred. That's right. So it's your position it occurred at 1. But it's your position it was certainly inconsistent with what this eyewitness said later. That's correct, Your Honor. But you do think it occurred at 1. That is your position, isn't it? My position is that it occurred when – or our position is that it occurred when the detective testified it occurred. And when he received the report of a shooting, that it occurred at 1, and that Michael Bryant, you know, mistakenly said that the shooting occurred at a different time. Well, if you are now putting forth the alibi testimony, if you talk about McGee, Devon McGee. And McGee, yes. Right. But starting with him, he would say that the phone call came at about 11, that the twins had been shot. And then he and Christian started their journey back, bus, train, to get back to that neighborhood. So how did that phone call happen at 11 if the shooting happened at 1? Yes, Your Honor. And our position is – or my position is that he made a mistake about the exact timing. What's critical here is that Devon made a mistake about exactly when. He wouldn't be expected to remember exactly when he gets the phone call. The important point here is they spend the night and they get a phone call that these twins had just been shot. But isn't that – doesn't that go to their response to your unrebutted alibi, that the shooting actually occurred in mid-afternoon and that the alibi actually didn't really support the timeframe when the shooting occurred? Well, no, Your Honor, because the phone call was about the shooting itself. So whether – But the phone call, according to the witnesses on the defense, occurred at 11 in the morning before anyone was shot. One witness said that. What did the other one say? The other witness said sometime in the mid-morning, late afternoon – or mid-afternoon, they get a phone call. What they recall about it is that they get a phone call, and the phone call is about the shooting of the twins. And that's – you know, that's why they remember that particular day. That's why they remember what happened the night before and the day of and what they were doing. And, in fact, there is evidence in the record that the sister, Lativia, said to – testified that her mother and her brother told the police that Christian was there, that there was an alibi. So it isn't like this alibi just came up at trial for the first time. And that's – that is something that the court in People v. Gardner found important and significant with respect to the alibi evidence and why it shouldn't be disregarded. How did the alibi evidence come up before? Well, the evidence – the testimony in the record is through the sister, Lativia. She testified that her mother and her brother told the police about the alibi. That's the evidence. Oh, and that wasn't objected to. That wasn't objected to, and it wasn't impeached. And so hearsay for what it's worth stands under the case law. Yes. It's considered evidence. Yes, Your Honor. Now, as I said, with respect to the first point about Michael Bryant, who the case rests on, the case begins and ends with Michael Bryant for the state. First, the – his initial description of a stranger, he goes from describing a stranger to someone he knows well. That contradiction, that devastating contradiction, raises and merits reversal in this case where there's no reasonable explanation for why there's such a sea change. And I want to address here both the prior facts findings and Michael Bryant's explanations for why there's been such a change from stranger to well-known person. Well, what is his first explanation? His first explanation – well, first he testified that he told Detective Rios the truth. That's the first thing he says. Later, when asked, you didn't tell Detective Rios about the – sorry – about the Christian, he says, well, I didn't like his vibe. That's his testimony. Then a different time, he said – he doubles down and actually says, well, no, I did tell him. I did tell him that this person had raccoon eyes, that he had Hispanic-like hair, that he had dark circles under his eyes. All testimony that was contradicted by Detective Rios and corroborated by his notes – by Detective Rios's own notes, and critically, while the prior effect credited Michael Bryant's testimony, she did not discredit Detective Rios's testimony, did not find that Detective Rios fabricated or exaggerated or omitted information from his own testimony. So this description that Michael Bryant initially gives Rios and then later changes with no reasonable explanation is contrary to human experience. If one knows the individual who just attacked your brother, in that state of shock, it's sort of like an excited utterance. It's a situation where one would expect the person to be most – Isn't this a little bit different when you have someone – he was shot in the head, wasn't he? He was shot in the head, Your Honor, but, you know, we also have – And he said that his concern at that time was really the life of his brother. Didn't he say something like that? Yes, Your Honor, he was – and understandably – And also, didn't he also say that he was also being sewn up? That is what he testified to. Yes, Your Honor, and understandably, he was concerned about his brother. And he was the recent victim of a gunshot wound to the head. Absolutely, Your Honor. All right. Notwithstanding that, and given that, in fact, he gives this detailed description that is completely contradicted by a later identification. He could have said, I know who it was. He could have easily said, you know, don't bother me now. It was Christian. He could have. And there's no reasonable explanation for why he didn't. And I think that's the point. The trial report, you know, makes the finding that with respect to his prior identification, Detective Rios was no nonsense in his demeanor. And therefore, she could understand or the trial court could understand why Michael Byant may not give him all of the information. But that's not what happened in this case. The inference doesn't follow from the evidence. Michael Byant did speak with Detective Rios. Michael Byant did give this detailed description. Michael Byant himself said that he spoke to Detective Rios and initially said he told him the truth, then said he didn't like his vibe, and then a third time changed again and said, well, I did give him this description of Christian. So for that reason, this prior description badly undermines the entirety of his testimony and requires reversing. In addition to that, though, there are... We've had cases where witnesses were reluctant to say things to the police initially or afterwards. We've certainly had cases where a witness identified a perpetrator and then at trial recanted. Absolutely. And trial courts will sometimes and juries will sometimes say, we believe the initial ID, not the recantation, and this court has often upheld those because there's credibility determinations and all the like. This is admittedly a little different. He was reluctant on the front end and then he came forward. I mean, if Christian's guilty, of course. I mean, if we're looking at this from the state's viewpoint, I mean, he clearly did not identify Christian initially. But Judge Mendoza looked at it and thought it was understandable that he might not have done that. It didn't necessarily mean that it didn't happen, given the state he was in, given that he didn't particularly like the judge, the officer questioning him, given that he was more concerned with his brother. And he was probably not all there at that moment if he had been just shot in the head and lost a lot of blood. She seemed to think that that was not a fatal flaw. Who are we to now step in and say, no, you're wrong, Judge Mendoza, we know better than you. Thank you, Your Honor. And, of course, you know, the question about rehashing credibility determinations, a question the state raises in its own briefs is one that I want to address and have been trying to address. I'm not asking this Court to rehash credibility or demeanor determinations. And, again, I respect that the trier of fact is given deference with respect to those determinations. But in this unusual case, as this Court has done in other unusual cases, such as people v. Shaw and people v. Smith, people v. Gardner, and people v. Nellens, where the manifest weight of the evidence doesn't support conviction, this Court has a role and a responsibility to reverse. And given here this unusual circumstance, and, frankly, and in – Of those four cases – Yes. I don't know that you would compare it to Gardner. But of the four you cited, which one do you think best supports your argument today? Without going into it, just tell us number one of those four. Because Gardner's really a completely different pattern. But of the other three. Well, Your Honor, I – Or maybe you do think that Gardner's the most supportive. Well, respectfully, I do think – I think people v. Shaw and people v. Smith are cases that are somewhat similar and are cases that – where the Court did reverse based on insufficiency. Here, I think what's even more unusual, and to be clear, in people v. Shaw, the Court says, you know, it is the trier of fact who must weigh minor inconsistencies. And – but where there are major inconsistencies in the record, where there are major inconsistencies between what the witness testified to at trial and his statements to the police, then, you know, those inconsistencies warrant a second look and, in that case, warrant reversal. And here, similarly, not only is that initial description so devastating to his testimony, because where the only issue is ID, as it is in this case, that matters a great deal. Here, there are material inconsistencies between his testimony at trial and his report to the police. And those material inconsistencies – Michael Bryant was repeatedly impeached at trial about what he told Detective Rios, when he told – when he said it to him in terms of the description of the suspect. The – he testified – Michael Bryant testified at trial that he did say that the shooter was wearing a black T-shirt, brown or tan pants, black and red Adidas shirt. Detective Rios contradicted that and said, no, he didn't say that, and he had his notes as corroboration and testified to that. Michael Bryant testified that he described two shooters to Detective Rios, and Detective Rios said, no, he didn't say that. He described a single shooter, the shooter who shot Trevettis. Michael Bryant testified that he described the shooter as having raccoon eyes, dark circles under his eyes, this hair that was unique. And Detective Rios testified – Curly straight. Curly straight, yeah, exactly. And Michael – Detective Rios testified, no, he didn't say that to me. Michael Bryant testified at trial that he recognized Christian instantly, yet said nothing about it. Each of these contradictions, each of these material inconsistencies, are another reason to doubt, and no rational trial of fact could have heard all of that and convicted Christian based on this single witness. Now, the third reason with respect to sufficiency, in addition to the reasons we cite in the brief, but the third reason with respect to sufficiency in Michael Bryant's testimony about the identification relates to Michael Bryant's testimony about the second suspect in this case. Michael Bryant said different things about whether there were one or two shooters and about the identity of the second shooter. With respect to the second shooter, Michael Bryant claimed first that there was someone nicknamed Bunchy, Devon McGee, short hair, medium complexion. That was the description he gave. And though he didn't say he was 100% certain when he circled his photo at the identification procedure, he said, I'd have to see a lineup. But that's the person who I believe was the second shooter. About a year later, he's sitting in the state's attorney's office, he's told Devon McGee has an alibi, and he says, look, it was somebody else, somebody by the name of Donovan McGee, who also goes by the nickname of Munchy, who has dreadlocks, and importantly, is someone different than Devon McGee. That's the claim he makes. He does not in any way attach any caveats to it. That is, he doesn't say, or at least that's not the stipulation entered into evidence. He doesn't say, I may be mistaken, I'm not sure about the names, I may be confused. With respect to that time in the state's attorney's office. But he said he was told by Galliardo that there were dreadlocks. At trial. At trial. Once confronted, first he says, yes, I was told, well, first he says I was confused. And then he changes that story and says, well, actually, when I met with Galliardo, I was told information about the suspect, and I was told that this person had dreads. He'd heard that the person had dreads. And so I went with that. This case rests on the identification. It rests on Michael Bryan's credibility and his ability and reliability to perceive the identifications and to credibly make it. When you have a witness who has testified that he was fed facts and that he took those facts and then regurgitated them as if they were his own observations and doesn't say until later that the detective gave him those facts, that's troubling. And that alone is a reason to reverse this conviction in this case, Your Honors. In addition to all of those reasons, there was no independent or physical corroboration in this case. No motive whatsoever. Fourteen-year-old kid. Testimony is he was friendly with this kid, that Christian and the Bryan brothers were friendly. No explanation for the shooting. No gun found on Christian or even any testimony that Christian has ever seen with a gun in this case. Separately. No admission by Christian. No flight or consciousness of guilt by Christian. That is, he turns himself in to the police on an unrelated electronic monitoring violation the day after. Inconsistent here with guilt. No blood or blood spat or gunshot residue or any sort of other evidence when they have this kid. The day after. No other independent or physical corroboration connects Christian to this case. That, with the weak ID, is a reason to doubt and no rational prior effect could have convicted based on that. Counsel, when Michael Bryan later spoke to Galliardo and identified the clothes that Christian was wearing, I can't remember if this was August 3rd or August 9th, but one of his conversations with Galliardo, he then goes into detail about what clothes Christian was wearing. The clothes he describes are verbatim what Christian was wearing when he turned himself in the next day, right? Your Honor, those, well, two things. One, what he testifies to is that he told Detective Galliardo, my recollection is he testifies that he told Galliardo the clothes Christian was wearing. That was the testimony. At trial, he was asked, he also testified that Christian was wearing the brown or tan pants, the black and red Adidas shirt, okay? But there wasn't independent corroboration. That is, it's not like Galliardo. So we don't know if he actually said that to Galliardo.  We don't know that he actually said that to Galliardo, first. Second, you know, this is a witness who has admitted to having been fed facts about Christian. Well, that's what I wanted to ask you. Yeah. Is there any evidence in the record that Galliardo had access to that inventory belongings intake sheet that described all of his clothes before he spoke to Michael Bryant? Is there any way that that information could have been given to Michael Bryant? I'm not saying there was. I'm just saying is there any possibility in the record that that could have happened? Your Honor, I think that there's no way to conclude one way or the other about that. That's just a matter that's not in the record. I would merely be speculating. Okay. Who's the detective that didn't testify? The lead detective, Detective Galliardo. So he didn't testify at trial at all? No. And finally, in addition to this lack of independent or physical corroboration, Your Honors, the alibi evidence in this case, something that I've already spoken about, so I won't take too long talking about it here. But, you know, in People v. Nellens and People v. Gardner, the court makes clear that evidence of alibi may not be disregarded where the only evidence of guilt rests upon a single identification, such as the one here, and a weak identification based on the material omissions and impeachments. Okay. Let me make sure I understand this. So Devon McGee testifies at trial that the phone call about the twins being shot came in at around 11. That's his recollection. That's his best memory. That's right. That's what he said at trial. That's right. Yeah. His sister thinks it was more like 1 or 2 o'clock. Later. But he says it was at 11. And he says he gets into the train station, gets off the train at Pulaski and 21st. We're very close to the murder scene. He said that was at 1.10. Right. Right. He says that I remember asking the train lady, and she said it was 1.10. Right. Okay. Isn't that about the time the shooting happened? Well, according to the detective, you know, a few minutes earlier. According to you. Yes. And according to our... Isn't that your theory, that the shooting happened at 1 o'clock? Earlier. Earlier. That's right. A few minutes earlier. Around 1 o'clock. Around 1 o'clock. But, Your Honor, this isn't all that different from Michael Brine saying, well, I think the shooting happened at 3. I think it's completely human to mistake the times. It's, in fact, not incredibly credible evidence. Normally the call that came in could have been established, and that's not your burden. That's right. There was no testimony about when the call actually came in. I mean, for the actual call. I don't mean someone testifying like Cleos. There was no testimony about the 911 call. Was there? No. No, Your Honor. There was no testimony about the 911 call. And so... Right. So the time isn't really particularly certain in the record. No. You're arguing it's at 1. Michael Brine said it was at 3. Right. There's no... Cleos said he got the call. Didn't he say something about the time frame? He's the one that you say suggested it actually happened at 1. It was earlier. That's right. Earlier. So, I mean, Your Honor, I think it was fair to say on this record is that the exact time frame is not set. But now withstanding that, what's critical about the alibi witnesses is that they have this recollection and testified to it about getting this call about this very unexpected event. And they go there. And they remember seeing the tape. For all of those reasons, the absence of evidence and the evidence presented at this trial, the State's evidence was not sufficient beyond a reasonable doubt. And no rational prior effect could have or should have convicted on this evidence. And I'm asking this Court to reverse Christian's conviction. Thank you, counsel. Thank you. Mr. Alexander? Good morning, Your Honors. May it please the Court. I'm Assistant State's Attorney, Joseph Alexander, on behalf of the people of the State of Illinois. In this case, Michael Bryant positively identified minor respondent as the person who shot Travidus Bryant. Michael's identification was positive. reliable, and credible. The trial, in fact, heard all of the evidence presented at trial, weighed that evidence, resolved any inconsistencies and conflicts in the evidence, and found that Michael Bryant was a credible witness. If he was so credible, then why didn't the State call the two detectives to whom he gave information, Leos and Galeano? Why didn't you call them? The decision of the trial attorney to call witnesses is something that I can't second-guess. I can only argue what we have in the record. And in this case, we had a very credible eyewitness to the shooting, who we called, who positively and reliably identified our minor respondent as the shooter of his brother. Here's the problem I have. If you have your brother shot, hurt bad, and you question about that shooting, and you know who did the shooting, wouldn't you want to give that name right then and there? That's the first thing. He shot, Christian shot my brother, hurt my brother, has him in here about to die? You're at a level with all due respect. You're asking me to speculate and say what I personally would have done in this case, and I can't do that. What I can tell you is that Michael Bryant, when he gave this first interview with the detective, had been shot in the head, was in the hospital, had his head stitched up. He didn't want to talk to this detective. The Detective Leos testified that Michael wasn't very cooperative. He wasn't friendly. He was preoccupied with whether his brother was dead or alive. The trial of fact heard that explanation as to why Michael Bryant didn't say Christian is the shooter, and the trial of fact believed that. And in this situation where this court is confronted with a cold record, it's best for the trial of fact to make those credibility determinations. And this court shouldn't second-guess the trial of fact simply because this court might re-weigh the evidence differently, or... The biggest idea is a rubber stamp for everything that the trial of fact... This court is not required to rubber stamp the trial of court's credibility determinations, but this court is required to give considerable deference to those credibility determinations. And again, we have in this case the trial of fact hearing all the evidence and then possible 21-page ruling explaining not only her legal findings, but her credibility determinations in great detail, recounting the evidence that the trial of fact heard and saying, this is why I believe Michael Bryant. If I may interrupt you, Mr. Alexander. What day is it that Michael Bryant identifies Christian, the respondent, as the shooter? There's two dates in August when he meets with two different detectives, correct? He met with Detective Gallardo on August 3rd, and that's when he identified Christian by name, gave the description, gave their relationship, and said that he knew Christian from the neighborhood. And then on October 9th is when he... August 9th, right? Yes. I'm sorry. August 9th is when he, I believe, viewed the physical line-up and made the positive identification and stated that he was 100% sure that Christian was the person that shot his brother. Is there a concern when, even if the initial interview, and granted he had been shot in the head, and his brother, you know, there was certainly a question whether he was going to survive. Is there a concern, though, that even in that interview, he doesn't even talk about two shooters? Well, the record, and this is something that the trial effect had to deal with and the trial effect resolved. How did she resolve that? Well, it boiled down to credibility. And what the trial effect found was, even with Detective Rios' testimony, after that testimony, it wasn't clear whether Michael was responding, was describing one shooter or two. And if we look at Detective Rios' testimony... She also said it was likely that he was describing the person that was shooting at him. Right. And that's when we get into Detective Rios' testimony. One of the questions asked during the testimony was, and this is in the record on page 133, did Michael describe the person that shot his brother? Detective Rios responded, he gave me the description of the person who shot him. And the follow-up question, follow-up from the defense counsel was, yes, just answer the question. Yes, now did Michael describe the suspect? What we have in this record are very vague questions posed to the witnesses by counsel. And if you look at the record, there were objections based on vagueness. And the trial court, listening to this evidence, listening to these questions, sustained that objection saying, I'm not even clear about what you're asking. And it wasn't because of the witness' testimony. It was because of the questions that were being asked of that witness and the way they were phrased. And if you look at this, did Michael tell you that his brother was shot by the same person? Well, Detective Rios says, no, he didn't tell me he was shot by the same person. So that question in and of itself leaves open that there could have been two shooters. And in this case, Michael said he was describing, if you look at Michael's testimony and the questions asked, again, it was, who are you describing? I'm talking about the person that shot me. Or, I'm sorry, I'm confused. What are you asking me? And that was a product of these questions. And, again, the trial, in fact, heard all of this evidence, heard my response out loud. So Michael testifies at trial that he described two shooters to Rios in the hospital. He says, I described the raccoonish eyes, the hair that looks non-African American. He admits he didn't say Christian, didn't say him by name. But he said, I described Christian by description. And I described the second person. He swore under oath that he talked about both of those things at trial. Rios gets up and says, I only heard about one person. Maybe Michael Brandt didn't specifically say there was only one person, but he only described one person. Coming up from the gangway, which sounds a lot to me like the second shooter, if there's a second shooter, with a description. So in the light most favorable to the state, what are we to make of that? Is Michael wrong, or is Rios wrong? That's a credibility determination that the trial, in fact, made. What did the judge say about that? What did the judge say about that? If I can just start really quickly. This case is really about credibility. That's what it boils down to. Who is more believable? Who the trial, in fact, thought was more believable? Was it Michael, or was it minor respondent's alibi testimony? How about Michael versus Rios? What did the judge say about that? But that's part of minor respondent's defense. Like, you can't believe Michael because Detective Rios testified to this. The trial court said, even though Michael might have identified this other person or gave a different identification to Detective Rios, that does not undermine his credibility when it comes to the identification he made of Christian. That's what the trial, in fact, found based on listening to the evidence, watching these witnesses as they testify. The trial, in fact, made a credibility determination that even in light of Detective Rios' testimony, Michael Bryant was still a credible witness. Michael Bryant credibly identified minor respondent as a shooter. And that determination, based on the case law in this state, is entitled to considerable deference. It is a reason the trial, in fact, could look at this evidence, look at all of the testimony, look at Michael's explanations, and find that Michael was a credible witness. And what defendant is asking, I'm sorry, what minor respondent is asking me to do today is to basically relay this evidence and retry him on appeal and find that his witnesses and his alibi were more credible than minor respondent. I'm sorry, Michael Bryant. That is the only way that this court can reverse that conviction is by making credibility determinations that the trial, in fact, has already made. Well, but that's not really the actual law, is it? That would mean that we can't ever reverse a conviction that we don't find supported by reasonable doubt. Well, no, that's not. I mean, to say that we have to accept that the trial court made credibility determination that is absolute means that the appellate court can't review the record and decide whether a rational trial, in fact, could become the record. Well, but that's not necessarily true, Your Honor. What the court has to do in looking at this evidence is give deference to those credibility determinations. And when there's a case that is based purely on credibility, then giving deference to those may make it difficult for this court to reverse, but it doesn't tie this court's hands. And in this case, I want to quote the Supreme Court that says, due to the inherent limitations of reviewing a cold transcript, we must give the trial court's credibility findings considerable deference. This is the perfect example of why we have this standard. If we look at Detective Leo's- Well, I mean, the law has long been that a conviction based on the testimony of a single credible witness can stand. No question about it. That's clearly in the precedent of our state and likewise across this country. But this is a case with no other evidence of any kind besides the testimony of a single eyewitness. There is no physical evidence. There is no statement. There was never anything really to tie him physically in any way to this defense. Isn't that true? There was no physical evidence, but, again, you don't need physical evidence to convict. As you said, it's a single credible eyewitness. And this court, again, found Michael credible. And in order to reverse this conviction, as I said, you have to find Michael not credible. You have to find the defendant's alibi credible. You have to find Detective Leo's credible. We have to find he's not credible. Can he be mistaken? And there's no physical evidence of any kind that actually supports his testimony. And we have these issues regarding his initial discussion of the possible offender when he's at the hospital. I mean, it could appear that his testimony to Rios is that there weren't even two shooters. I mean, there are some credibility questions about him because he doesn't name this person that he says he knows at the first instance. That's correct, and he doesn't. And the state is not minimizing that or trying to run from that fact. He did not identify Christian by name during that initial interview. He gave a description that might not have been accurate as applied to Christian where he was off on the height and the weight. But assuming that he did identify Christian, that was his identification of Christian, the fact that he was off by height and weight isn't. He was way off. Counsel. He was way off. He was way off, but, again, this court has found that. You're making the argument right now that the description he gave to Rios was Christian? I'm making the argument that it could have been. What we have is a victim who was shot in the head talking to a detective who testified. I gave the detective a description of two people. We have a detective say, I went there. I was trying to get information. It was a preliminary interview. It was quick. He didn't want to talk to me. What we have are two witnesses giving evidence or testimony that's not clear. And the trial fact found that. I am still not certain whether Christian was describing, based on Detective Rios' testimony, whether Christian was describing one shooter or two shooters. But the trial fact said, you know what, that does not undermine the fact that when he talked to Detective Guglielmo, he identified Christian. He has been consistent in his identification of Christian. He has not wavered in that identification. And I find that credible. Was there any suggestion, Mr. Alexander, that that was fed to him? There's no indication that testimony about Christian or the identification with Christian was fed to him. If we look at this case and defense counsel's brief, what they're doing is they're focusing heavily on this second shooter. But if we look at the trial record, when the state tried to get into discussions about this second shooter and what Michael said at this interview with the state's attorney, defense counsel objected, saying the second shooter isn't even relevant. And it's not relevant in this situation where Michael has positively and reliably and unwaveringly identified minor respondent as the person that shot his brother. Now, what he did with the second shooter, second shooter's not on trial, second shooter's not part of this appeal. Isn't his credibility as a whole an issue at that trial? I'm sorry? Doesn't that go to his credibility? You have to look at what he said about the second shooter. It does go to his credibility. And the trial court found that he was absolutely even more credible. So when we judge the trier of facts finding credibility, don't we have to look at what everything was done and judge whether or not the trier of facts finding can stand up to scrutiny on appeal? Don't we have to look at that? You can. And in this case, Michael's identification and credibility stands up to scrutiny. Because if you look at this record, counsel says the detectives fed Michael information. Michael testified that the detective told him what other people were saying. About the other shooter. About the second shooter. And even though Michael had the opportunity to identify the second shooter, he did not do that. Even though this is what this detective is telling me, I'm not sure. I'm not identifying him. But that never happened with Christian. He has consistently identified Christian. And when we get into the situation where there's this Devon McGee and Donovan McGee, Christian, I'm sorry, Michael explained that. He only knew the second shooter by his nickname. He didn't know his real name. So when the state's attorney is saying Devon has an alibi, well, maybe I got the name wrong. And Christian explained, I got the, you know, this is all part of, this is what the detective was telling me about what other people were saying. And I got confused. Michael was very credible when he testified to that. And the trial court took that into consideration, that if he wanted to identify the second shooter, he could have. But he did not. How do you respond to the suggestion that the alibi in this case was unrebutted or impeached? Well, first I want to clear up something about the alibi. There were only two witnesses that testified in the trial about the alibi. That was Devon McGee, who was possibly the second shooter, and Lakevia Williams, who was the sister of Levon Williams, who was the person that McGee supposedly was going to see. She testified that counsel asked her, did any of your family members talk to the police about this case? She said, yes, my mom and brother. There was no discussion about the substance of that conversation. There wasn't? There wasn't. That the mother and the brother had with the police. So there's no testimony in the record that suggested here that actually says that they talked to the police and they provided an alibi and that Christian and Levon were at their home? That's not in the record? That's not in the record. Let me make sure that we're on the same page. What's not in the record is Lakevia's mother and brother testifying that they spoke to the police and that they said that my responder was with them. All that Lakevia testified to was that her mother and brother spoke to the detective. We don't know what they said, and they weren't called to testify as alibi witnesses. So it's your position that the record demonstrates that all she said was when asked if they spoke, I don't know if she was asked when, but she said my mother and brother spoke to the police? Yes. Okay. That's what the record positively shows. They spoke to the police. What about the time frame? What is your position as to when this shooting occurred? This goes to the unbelievability of the alibi. McGee testified that it happened that he learned about this shooting earlier in the midday. The shooting didn't occur until either 1 or 3. Whether the court believes it happened at 1 or 3 doesn't matter because he testified that he heard about it at around 11 o'clock. So how could he hear about a shooting that didn't occur? Well, didn't the state put on Darlene Riley? Didn't the state put on the mother of the twins? She did. We did. And didn't she think the shooting was at 1140? You're a witness. I believe she testified that it was at 1130, but we also, again, this is another issue. Did she testify about when she heard about it? She obviously wasn't a witness. She wasn't a witness. She was doing volunteer work when she got the call, and there is testimony that ‑‑ She testified about a shooting. About a shooting. And she said that the call came in at 1140. Right. That's what she said as far as the timeframe of the shooting. But, again, if there's a discrepancy between the timeframe, the trial in fact heard all of this. And the trial in fact, again, said, I find Michael credible. And the trial in fact is presumed to consider all the evidence. The defendant put this alibi on. What time do you think it happened? What is the state's position as to when this happened? Or is it the state's position that we'll never know? The state's position is that based on our witnesses' testimony, it happened at 3 o'clock. That's our position based on their testimony. And that's all that we are going on at this point. Were there any medical records or anything about when he got to the hospital? Any testimony about that? No, Your Honor. It was simply that he – There wasn't testimony about it, but there's no medical records in the record? No, not to my understanding. If I'm misremembering this correctly, I do apologize. All we have is that he was shot, and he thought it happened at 3 o'clock. He ended up being taken to the hospital by his friend. He lost a lot of blood. He was being stitched up when the detective talked to him. He wasn't very cooperative with the detective. He found the detective aggressive. And, again, we try, in fact, looking at the witnesses that they testified, said, I observed the officer. Although I wouldn't characterize him as aggressive, he was very assertive and very no-nonsense. And she could see how a person in Michael's position could characterize him as aggressive. And, again, that supports the fact that the trial, in fact, is in the best position to look at this evidence, to weigh it, to resolve any credibility issues, any inconsistencies, and make a decision based on that. Was there a return back to court in February of 2017? There was, Your Honor, and it's not in the record. But Michael, on the way back, was sentenced to – I'm sorry, Christian was sentenced to five years probation. We do have that information. If the court would like – I'm just curious. I remember reading that there was a return to court. He was sentenced to five years probation with conditions, one of them being a curfew at 8 o'clock. And he's supposed to complete some program at Northwestern. And, again, if the court wants that, we can supplement the record with that information. But based on this record, based on the law that's in place, the trial, in fact, heard all the evidence, made credibility determinations, and found that Michael was credible, this court should reject defendant's invitation to re-weigh the evidence and essentially retry him on appeal. For the reasons stated here and those in our brief, we ask that the court affirm Michael Respondent's conviction. Thank you. Thank you, Mr. Alexander. Mr. Willough, rebuttal. Thank you. Now, I will be brief with respect to this. But first, to begin, the state's attorney, or the assistant state's attorney, Mr. Alexander, just told this court that Michael Bryan has consistently identified Christian, except for when he didn't identify Christian, and that's when he first gave the description. Secondly, there was argument presented now about the fact that it's not – Michael Bryan's testimony is not entirely clear where it comes to the identification. If the identification testimony is not clear, then that favors Christian, because, of course, the burden is on the state beyond a reasonable doubt. That lack of clarity here is the very reason why reversal is warranted. Third, Your Honor, with respect to – Your Honors, with respect to the conversation Michael Bryan's had with Detective Rios, while he was understandably both in a medical situation and concerned about his brother, he was forthcoming with Detective Rios. He testified. He told Detective Rios the truth. He gave Detective Rios a detailed description of the event and the shooter. Third, Your Honors, with respect to Detective Rios' testimony as to whether there were one – was one or if there were two shooters and their description given, I'd point the court to pages 136, 137, and 138 of the record, and I'll only briefly read this, Your Honor, but the question was asked, for clarification purposes, Detective Michael Bryan, Jr. described only one offender to you. Answer, yes. And the offender he described, did he tell you that that offender shot Travatis first? Answer, yes. And did he give you a description of that offender? Answer, yes. And then the – Where's the question about was he telling you that he shot him? That goes – that's earlier in the record. What does that say? Did Michael Bryan, Jr. describe the person that shot his brother? Answer, he gave me a description of the person who shot him. So the question was who shot his brother. Yes, Your Honor. Not who shot him. No, Your Honor. The detective says, what's his answer? Answer, I'll look at it and just read the question again for one more time. Okay, okay. Question, now did Michael Bryan, Jr. provide you with a description of the suspect who shot his brother? Answer, I'm sorry, what was that question? Did Michael Bryan, Jr. describe a person that shot his brother? Answer, he gave me a description of the person who shot him. As the question was about his brother. How about the alibi? Are you going to respond to that? The state's point? Well, let me – Yes. From the transcript and the record, again, if I may point the court to pages 203 and 204. On cross-examination, the state asked Lekevion the following types of questions. You never called the police during these nine months, did you? No. You never went to the police station and said Christian was with me, did you? No. Those were the questions asked, that kind of question. On redirect, the question asked was, and it started with, you were asked a number of questions about the fact that you didn't call the police. Answer, yeah, I didn't call the police. Question, okay, Lekevion, do you know whether your mother or other members of your family talked to the police about this? Answer, yeah, my mama, my mama and my brother, and then not me, though. So that's what you based your argument on, that they actually testified, that they referred this alibi to the police initially? Yes, Your Honor, because the cross-examination questions related to the fact that she didn't go tell the police about this. That's part of the argument.  Your Honor, for all the reasons that I have said and I have argued and that's in our briefs, this case rests entirely on the credibility of Michael Bryant, and this court, of course, gives great deference to the determinations of credibility and demeanor by the trier of fact, but those determinations are not conclusive. In this case, no rational trier of fact could have or should have convicted Christian based on this evidence, and I ask the court to reverse. And I thank you for your time. Thank you very much, counsel. Very fine job of arguing, and thank you very much for the very good briefs as well. It's a difficult case. We'll take it under advisement and stand adjourned.